IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STEVEN HICKCOX,

                    Plaintiff,                          Case No. 22-2363-DDC

v.

HYSTER-YALE GROUP, INC.,

                    Defendant.

## MEMORANDUM AND ORDER

Plaintiff Steven Hickcox's arm got crushed in the mast section of a forklift manufactured by defendant Hyster-Yale Group, Inc.  Plaintiff sued defendant under theories of strict liability and negligence.  Defendant moves to exclude the testimony of plaintiff's expert (Doc. 65) and for summary judgment (Doc. 66).  The court grants defendant's Motion to Exclude plaintiff's expert and, as a result, grants defendant's Motion for Summary Judgment.  The court explains these decisions, below.

### I.      Background

Plaintiff worked as a forklift[1] operator for Estes Express Lines, Inc. in Kansas City, Kansas.  Doc. 63 at 2 (Pretrial Order ¶ 2.a.i.).  On August 7, 2020, plaintiff was at work, unloading pallets from a semi-trailer and driving a forklift manufactured by defendant.  *Id.* (Pretrial Order ¶¶ 2.a.iv., vii.).  That's when the accident occurred.  The court recounts the accident, below.  But, first, it describes the relevant forklift.

---

[1]          Defendant calls it a "lift truck."  *See generally* Doc. 65.  Plaintiff uses both terms.  *See generally* Doc. 70.  The court follows the lead of the Pretrial Order and uses the more common term "forklift" to describe the machine at issue.

*The Forklift*

The forklift was a S40-70FT model, manufactured in 2017.  The forklift's operating manual provides the following illustration of the S40-70FT—note the mast, labelled as number eight:



Doc. 65-2 at 12 (Def.'s Mot. Lim. Ex. 1 at 10).

The operator's seat faces a panel that includes a steering wheel and several levers.  *See id.* To the right of the seat are hydraulic mini-levers that raise and lower the forklift's mast and the forks attached to the mast.  *Id.* at 49 (Def.'s Mot. Lim. Ex. 1 at 47).  To raise the forks, the operator pulls the lever back.  *Id.*  To lower the forks, the operator pushes the lever forward.  *Id.*

The forklift has an Operator Presence System (OPS).  *Id.* at 84 (Def.'s Mot. Lim. Ex. 1 at 82).  If the forklift's operator leaves the seat with the engine running and no parking brake engaged, then an electrical switch automatically shifts the forklift's transmission into neutral within 1–2 seconds after the operator leaves the seat.  *Id.*  This OPS design, with its slight delay, allows an operator to reposition himself without disengaging the transmission.  *Id.*

***The Accident***

Plaintiff has 25 years' experience operating forklifts.  Doc. 65-3 at 13, 14 (Pl. Dep. 45:10–19, 46:2–11).  He understood the danger and injury risk of putting an arm, or any body part, in the forklift's mast.  *Id.* at 12 (Pl. Dep. 40:10–15).  On the day of the accident, plaintiff inspected the forklift before operating it, and found no issues.  *Id.* at 20 (Pl. Dep. 73:4–10).  When he used the forklift that day, plaintiff didn't have any problems with the forklift's steering, directional control, or the seatbelt.  *Id.* at 31 (Pl. Dep. 115:4–22).  And plaintiff wore the seatbelt.  *Id.*

As already mentioned, on the day of the accident, plaintiff unloaded pallets from a semi-trailer.  Usually, when unloading multiple palettes, plaintiff would pick up a pallet and simultaneously scan another pallet.  *Id.* at 33 (Pl. Dep. 122:12–123:6).  On the day of the accident, plaintiff followed this usual practice.  Plaintiff lifted a pallet and, when the first pallet was high enough that plaintiff could see the label for another pallet, he went to scan the label of the other pallet.  *Id.* (Pl. Dep. 124:2–15).  While plaintiff scanned, he slowly backed the forklift out of the trailer, carrying the first pallet.  *Id.* (Pl. Dep. 124:16–125:9).  As plaintiff reversed out of the trailer, he hit something on the floor that jarred the forklift.  *Id.*  This jarring threw plaintiff off balance because he had leaned forward as far as possible to scan the label on the second pallet.  *Id.*  His arm went through the forklift's mast and the lift came down on plaintiff's arm.  *Id.*  Plaintiff sustained serious injuries to his arm.

The court must address an additional allegation about the accident before it considers plaintiff's expert report about the forklift's design.  Plaintiff's summary judgment facts assert: "As Plaintiff was falling forward into the [forklift's] two mast sections, the bar code scanner's cord caught the [forklift's] lever controls, causing the [forklift's] mast to drop."  Doc. 71 at 11 (Pl.'s Summ. J. Opp'n).  To support this statement of fact, plaintiff cites his own factual

allegations in the Pretrial Order. *Id.* But plaintiff never supports these *allegations* with any *evidence*. *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring a party asserting a fact that is or is not genuinely disputed to "support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"). The court thus doesn't consider this particular factual statement at summary judgment because it's not supported by evidence—as required in Rule 56(c)(1)(A). Nonetheless, the court mentions plaintiff's allegation—that the scanner's cord wrapped around the forklift's levers and caused the mast to drop—because plaintiff's expert expresses an opinion about the forklift's levers.

With this background, the court now turns to defendant's Motion to Exclude plaintiff's expert (Doc. 65).

## II.        Motion in Limine

Plaintiff retained an expert, Kevin B. Sevart, to evaluate the forklift's design. *See generally* Doc. 65-4 (Sevart Report). Mr. Sevart is a professional engineer. *See id.* at 1. Mr. Sevart's expert report explains the methodology he used when analyzing the design of the forklift. *Id.* at 2. He refers to it as "the design hierarchy:"

"a. Eliminate hazards if possible without unduly compromising the function or utility of the machine.

b. Provide some form of physical protection or guarding from remaining hazards.

c. Provide warnings and instructions, which can practically be followed, for avoiding the hazards. However, warnings are not a substitute for guarding."

*Id.*

In the design analysis section of his expert report, Mr. Sevart identified a "significant hazard:" the forklift's "shear point between the two mast sections which is accessible by a seated operator." *Id.* Mr. Sevart explained that the "risk associated with this hazard is that of serious injury or death to the operator." *Id.* And he explained that the "hazard and risk associated with shear points has been recognized by knowledgeable engineers for more than fifty years prior to the manufacture of this forklift." *Id.* Mr. Sevart's analysis continued, "[h]azardous shear points should be eliminated from a design if feasible. Any remaining shear points must be guarded to prevent entanglement. Appropriate warnings and instructions should be provided in conjunction with the physical means of protection." *Id.*

Mr. Sevart's expert report then provided his opinion. Mr. Sevart based his opinion on his

> knowledge of the industrial equipment industry; knowledge of previous injury/accident investigations; knowledge of the industry safety standards for this machine; knowledge of what other industries were utilizing in their designs to protect workers from recognized hazards; knowledge of machine design and human factors as it relates to the design of the machine; accidents on similar equipment and design alternatives that would prevent serious injuries such as those suffered by [plaintiff], as well as [Mr. Sevart's] understanding of this accident[.]

*Id.*

Mr. Sevart proffered the following eight opinions, summarized below:

1. The forklift was unreasonably dangerous and defective in design;

2. Defendant "was, or should have been, aware of the hazard of operators being entangled in shear points of forklift masts[;]"

3. The forklift's "design defects were present . . . when it left the control of" defendant;

4. The forklift's defects caused plaintiff's severe injuries;

5. Defendant "reasonably anticipated or should have anticipated that not all operators of their forklifts would have sufficient knowledge and information to have a full appreciation of the hazards and risks associated with the machine. The forklift was more dangerous than an ordinary operator would be expected to appreciate[;]"

6. Based on information available to defendant before the forklift's manufacture date, defendant reasonably should have anticipated the accident and injury;

7. Plaintiff used the forklift in a foreseeable manner at the time of the accident;

8. "ANSI/ITSDF B56.1-2016 Safety Standard for Low Lift and High Lift Trucks, requires that the operator, in the normal operating position, shall be protected from moving parts that represent a hazard.  The subject forklift did not comply with this provision of the safety standard."

*Id.* at 2–3 (internal quotation marks omitted).

Mr. Sevart also opined that defendant could've used three alternative designs for the forklift:

1. "The Hyster S40FT Forklift should have been provided with a guard to prevent a seated operator from contacting the shear point between the mast sections.  The guard could consist of a large mesh or grate type guard or a windshield.

2. The Hyster S40FT Forklift should have been designed such that the mast controls were protected from inadvertent activation.

3. The Hyster S40FT Forklift could have been designed to minimize the shearing motion between the mast sections.  This could have been accomplished by enlarging the distance between the two crossmembers."

*Id.* at 3.

## A.    Expert Testimony Legal Standard

The court has a "gatekeeping obligation" to determine whether expert testimony is admissible.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).  When performing this gatekeeping role, the court has broad discretion.  *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citation omitted).  Courts exercise this discretion under  Fed. R. Evid. 702.  It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Our Circuit has directed trial judges to apply a two-part test when determining the admissibility of expert testimony under *Daubert* and Rule 702. *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013). First, the court must determine "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702). Second, the court "'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'" *Id.* (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)).

To qualify as an expert witness, the witness must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (citation and internal quotation marks omitted). To determine whether an expert's testimony is reliable, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

In *Daubert*, the Supreme Court identified four factors that—though not exhaustive—trial courts should consider when determining reliability under Fed. R. Evid. 702. They are: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer

review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.  *Id.* at 593–94.  The Supreme Court has emphasized, however, that these four factors are not a "definitive checklist or test," and that a court's gatekeeping inquiry about reliability "must be tied to the facts of a particular case."  *Kumho Tire*, 526 U.S. at 150 (citations and internal quotation marks omitted).

But in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," instead of the *Daubert* factors and scientific foundation.  *Id.*  For such testimony to meet the reliability standard, it "must be 'based on actual knowledge, and not mere "subjective belief or unsupported speculation."'"  *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1341–42 (10th Cir. 2017) (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 780 (10th Cir. 1999) (quoting *Daubert*, 509 U.S. at 590)).  "When expert opinion 'is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict' and will be excluded."  *Id.* at 1342 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

"The proponent of expert testimony bears the burden of showing that the testimony is admissible."  *Conroy*, 707 F.3d at 1168 (citing *Nacchio*, 555 F.3d at 1241).  "[R]ejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702 advisory committee's notes to 2000 amendments.  While *Daubert* makes the court the gatekeeper for expert testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596 (citation omitted).

The court has discretion to determine how to perform its gatekeeping function under *Daubert*. *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019). "The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated." *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (citations omitted); *see also United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir. 1999) ("The trial judge is granted great latitude . . . in deciding whether to hold a formal [*Daubert*] hearing."). Alternatively, the district court may satisfy its gatekeeping role without a formal *Daubert* hearing "so long as the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Goebel*, 215 F.3d at 1087 (quoting *Daubert*, 509 U.S. at 597). Here, exercising its discretion, the court concludes that it need not conduct a separate *Daubert* hearing to rule the parties' motions to exclude. The parties haven't requested a hearing. And the court has reviewed the parties' filings and attached exhibits carefully. The court finds that the parties have provided a sufficient record for the court to discharge its gatekeeping duty without conducting a hearing.

### B.  Motion in Limine Analysis

Defendant makes three arguments, urging the court to exclude Mr. Sevart's opinions. The court need only address two to resolve the motion. The court first decides whether Mr. Sevart's three alternative designs are reliable and analyzes each alternative design, individually. Then, the court addresses defendant's argument that Mr. Sevart is unqualified.

### 1.  Mr. Sevart's proposed guard design is unreliable.

The court begins with Mr. Sevart's first design alternative: "The Hyster S40FT Forklift should have been provided with a guard to prevent a seated operator from contacting the shear

point between the mast sections.  The guard could consist of a large mesh or grate type guard or a windshield."  Doc. 65-4 at 3 (Sevart Report).

Defendant argues that this design alternative is unreliable because Mr. Sevart never committed to a design for the guard; he never explains what the guard would look like, the material the guard should use, or how to install the putative guard.  Doc. 65 at 10–11.  Mr. Sevart never submitted a mockup and never tested his proposal.  *Id.*  Defendant also points out that Mr. Sevart's proposed guard implicates the operator's visibility from inside the forklift, but Mr. Sevart ignored the visibility requirements of the relevant safety standard.  *Id.* at 11.

Plaintiff doesn't dispute—nor could he—that Mr. Sevart failed to test this design alternative.  Instead, plaintiff argues that Mr. Sevart doesn't need to test his design because it "has been used successfully in the field for a number of years by a number of lift truck manufacturers including Defendant."  Doc. 70 at 13 (internal quotation marks omitted).  To support this assertion, plaintiff cites Appendix A of Mr. Sevart's expert report.  There are several problems with this argument.

To begin with, Mr. Sevart's report never asserts that forklift manufacturers have used guards successfully in the field for years.  *See generally* Doc. 65-4 (Sevart Report).  Nor does plaintiff direct the court to any portion of Mr. Sevart's deposition where he testified to this proposition.  That response is no more than gloss added by lawyers.  And as Rule 56(c)(1)(A) establishes, a lawyer's gloss is no substitute for evidence.

Also, Mr. Sevart never commits to a specific guard design.  Mr. Sevart's design alternative doesn't even commit to a material his proposed guard would use, suggesting "a large mesh or grate type guard or a windshield."  *Id.* at 3.  Mr. Sevart's expert opinion resembles the expert opinion from *Petersen v. Raymond Corp.*, 994 F.3d 1224 (10th Cir. 2021).  There,

plaintiff operated a forklift with an open compartment that didn't fully enclose his lower extremities. *Id.* at 1225. Plaintiff lost control of the forklift and "his left leg slid out of the open compartment and he crushed it against warehouse racking." *Id.* The *Petersen* plaintiff sued the forklift manufacturer, asserting that the "forklift's open compartment made it defective." *Id.* The *Petersen* plaintiff's expert offered the following alternative design:

> The lift truck could have been provided with several designs of doors including, but not limited to, a latching rear door, a spring loaded door, a magnet controlled door, and an interlocked door to provide further protection to operators from additional hazards. Properly designed doors that exist in the marketplace right now, or which could be easily manufactured (see the Elrod door) would have a negligible effect on the maintenance of the machine. The door should have been constructed out of a suitable material that would withstand the forces of impact generated during collisions, intrusions, tipovers and off-the-dock accidents. . . . The cost of providing such a rear door would be insignificant relative to the cost of the forklift. The cost of adding a latching rear guard to the Raymond 420-C50QM would have cost at most $250 if designed and installed at the time of manufacture rather than as an add-on.

*Id.* at 1227 n.3. The district court excluded this expert opinion because plaintiff's "expert failed to commit to *any definitive* feasible design alternative." *Id.* at 1226 (emphasis in original). Our Circuit affirmed. The Circuit noted that plaintiff's expert "made a point not to commit to any specific design." *Id.* at 1227. And, the Circuit explained, "[w]ithout a definitive design, neither Plaintiff's expert nor the district court could meaningfully compare any proffered design with the existing design. And neither could a jury."[2] *Id.* at 1228.

---

[2]     The court notes that *Petersen* applied Utah law. 994 F.3d at 1226. And Utah law requires a products liability plaintiff to "show that at the time of the injury an alternative, safer design, practicable under the circumstances existed." *Id.* (citation and internal quotation marks omitted). Kansas, on the other hand, doesn't require a product liability plaintiff to provide an alternative, safer design. *Messer v. Amway Corp.*, 210 F. Supp. 2d 1217, 1233 (D. Kan. 2002) (applying Kansas law). But the relevant state law inquiry differs from the federal, evidentiary inquiry demanded by *Daubert*. Indeed, in *Dhillon v. Crown Controls Corp.*, the Seventh Circuit affirmed the district court's exclusion of an expert—one who had failed to test his alternative forklift design—without discussing state product liability standards. 269 F.3d 865 (7th Cir. 2001).

Likewise, Mr. Sevart hasn't provided a definitive alternative design.  He doesn't commit to a specific kind of guard—mesh, grate, or windshield.  Plaintiff proffers evidence that the forklift previously had a plexiglass windshield, but Mr. Sevart never proposed a plexiglass windshield.  Thus, as in *Petersen*, the court can't meaningfully compare Mr. Sevart's proposed design with any existing design.  That's a problem for plaintiff because he relies on Mr. Sevart's Appendix A to show that manufacturers use guards in the field.  But, without a specific guard design, the court can't readily compare Mr. Sevart's designs to any designs in Appendix A.

And Mr. Sevart's Appendix A doesn't help matters.  As already mentioned, nowhere in Appendix A does Mr. Sevart (or any source) explicitly provide that manufacturers have used a guard successfully in the industry for years.  Instead, Appendix A includes photos of forklifts with different kinds of guards and Mr. Sevart's highlighting.  For example, Mr. Sevart's Appendix A features the following photo:



Doc. 70-3 at 41 (Sevart App. A).  This photo, and others like it, show that defendant, at some point in time, offered a forklift with some kind of mesh or grate installed on it.  Without any context or explanation from Mr. Sevart, the court can't surmise how the guard in the photo applies to the forklift at issue here.

Elsewhere, Appendix A provides forklift add-on price lists like the following:



*Id.* at 47.  This material in Appendix A shows that defendant, in 1991, offered cabs and glass windshields as a cab accessory on its "H40XL series."  But Mr. Sevart's expert report doesn't propose a cab—it proposes a "large mesh or grate type guard or windshield."[3]  Doc. 65-4 at 3

---

[3]        Appendix A includes several documents that mention cabs, but, because Mr. Sevart's alternative design doesn't include a cab, these documents are irrelevant.  *See* Doc. 70-3 at 36 (Sevart App. A) (Hyster Company lift truck ad from unspecified date describing optional cab add on); *Id.* at 50 (Hyster Company 1993 price list for industrial truck add on that includes a tinted windshield glass as a cab accessory); *Id.* at 52–53 (Industrial Cab ads from unspecified year describing cabs designed for Yale Industrial Lift Trucks); *Id.* at 54–56 (Industrial Cab ads from unspecified year describing cabs for certain Yale, Allis Chambers, and Towmotor lift truck models); *Id.* at 62 (Martin Cab ad from unspecified year describing foundry cabs), *Id.* at 65 (Master Craft ad from unspecified year describing deluxe enclosed cabs); *Id.* at 77

(Sevart Report).  And, again, without any explanation from Mr. Sevart, the court can't see how this applies to the forklift at issue in this case.

Appendix A also includes a few articles.  One is an article titled, "Industrial Design of a Narrow Aisle Sit-Down Lift Truck" from 1966.  Doc. 70-3 at 67 (Sevart App. A).  That article mentions that a Raymond Model 820 lift truck included a glass guard.  *Id.* at 72.  Again, without any context or expert explanation, this article is inconsequential.  The court has no idea how to compare a 1966 Raymond Model 820 to the forklift at issue here.  Mr. Sevart doesn't even propose using glass for the windshield.  At his deposition, Mr. Sevart mentioned both glass and plastic windshields.  Doc. 65-5 at 17 (Sevart Dep. 65:2–7).  And, from this article, the court can't tell whether a glass windshield used in 1966 remains the modern practice of forklift manufacturers.

Appendix A also includes a 1975 article titled, "Lift Truck Feature Safety Innovations." Doc. 70-3 at 57 (Sevart App. A).  This article provides, "Among the more special guards is a clear plastic shield between the mast and the operator of narrow-aisle (stand-up) lift trucks."  *Id.* at 60.  Again, Mr. Sevart hasn't opined that defendant should've designed a guard made out of plastic.  And, like the other article, this 1975 piece says little about modern forklift manufacturing.

In sum, Appendix A can't save Mr. Sevart's expert report.  Its materials are either undated or decades old.  Mr. Sevart also fails to connect any of the materials to his design alternatives.  And Mr. Sevart fails to provide a specific design that the court can compare to the materials in Appendix A.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit*

---

(1987 Yale Materials truck options for Product No. YC3600P describing cab option); *Id.* at 78 (1979 Hyster Company price list describing cab option).

of the expert." *Kumho Tire*, 526 U.S. at 157 (citation and internal quotation marks omitted). The court thus finds Mr. Sevart's first design alternative—a guard to prevent the operator from contacting the mast section—unreliable.  The court examines his second design alternative, next.

### 2.  Mr. Sevart's proposed mast control design is unreliable.

Recall that plaintiff *alleges* that the cord of his scanner became tangled with the mast controls and caused the mast to drop.  Mr. Sevart's second alternative design addresses this issue. He proposes:  "The Hyster S40FT should have been designed such that the mast controls were protected from inadvertent activation."  Doc. 65-4 at 3 (Sevart Report).  Defendant argues that this opinion is unreliable, so the court should exclude it.

Indeed, this proposed design alternative comes with even less detail than Mr. Sevart's first option.  When asked for more specifics about the design at his deposition, Mr. Sevart testified:  "What I'm saying is there's portions of the mast controls that are exposed that don't need to be exposed.  The entire shaft is exposed and should something come into contact anywhere along that shaft, . . . that would be able to activate that control."  Doc. 65-5 at 12 (Sevart Dep. 42:6–22).  Defense counsel asked Mr. Sevart to give an example of a Class IV or Class V forklift, made by any manufacturer, that includes the guard which Mr. Sevart advocated. *Id.* (Sevart Dep. 44:7–12).  Mr. Sevart couldn't.  *Id.* (Sevart Dep. 44:7–17).

But plaintiff counters, asserting that Mr. Sevart provided a drawing showing the type of lever guard he's suggesting.  Doc. 70 at 14.  But plaintiff doesn't direct the court to any document in the summary judgment record containing this drawing.  *See id.*  Though it can't be certain, the court assumes that plaintiff meant to cite the following page from Appendix A:



Doc. 70-3 at 5 (Sevart App. A).  But Mr. Sevart never explains anything about this illustration. The court doesn't know what the design represents and nothing in the record provides any help.

In plaintiff's brief, he asserts, "Mr. Sevart has also testified that Defendant also offers as an option on its lift trucks, fingertip style controls that would have eliminated that hazard that caused Plaintiff's injuries."  Doc. 70 at 14.  That's a bit of a stretch.  Mr. Sevart testified,

> Q.  Can you show me or point me to any Class IV or Class V lift truck in 2017 that came with the guards you're describing?
>
> A.  Well, one example of a forklift that minimizes exposed controls would be if the electronic controls on the S40 were utilized.
>
> Q.  So you're talking about the fingertip controls?
>
> A.  Yes.

Doc. 70-6 at 2 (Sevart Dep. 43:13–21).  Again, Mr. Sevart never committed to an alternative design.  He provided fingertip controls merely as an example.  And Mr. Sevart never mentions that he's provided a design of fingertip controls.  Put differently, the court has no idea if the illustration shown above is a drawing of a fingertip controls—or something else.

16

Without a definitive design, the court can't tell if Mr. Sevart proposes a novel or a common design. Mr. Sevart hasn't seriously considered an alternative design for the forklift at issue here, nor has he seriously considered the effect the proposed alternative design would have on the effective and safe operation of the forklift. *See Dancy v. Hyster Co.*, 127 F.3d 649, 652 n.3 (8th Cir. 1997) (affirming exclusion of expert testimony where expert opined that device he envisioned would work but didn't attempt to design the device and although expert proposed "some kind of mesh" in common use, he failed to consider seriously a design and effect of the design).

Again, plaintiff tries to save Mr. Sevart's opinion by citing Appendix A. Plaintiff's resort to Appendix A fares no better than his first. To the contrary, Appendix A emphasizes that Mr. Sevart hasn't committed to a definitive alternative design. Though plaintiff argues that Mr. Sevart proposed fingertip controls, Appendix A mentions a "shuttle clutch lever." Doc. 70-3 at 10 (Sevart App. A). Appendix A also includes an article that provides seven different methods for physically protecting controls against inadvertent activation. *Id.* at 14–15.

"Without a definitive alternative design, neither Plaintiff's expert nor the district court [can] meaningfully compare any proffered design with the existing design. And neither could a jury." *Petersen*, 994 F.3d at 1228. The court thus finds Mr. Sevart's second alternative design unreliable and thus excludes it. That exclusion leaves one design alternative for the court to examine.

### 3. The proposed mast design is unreliable.

As a final alternative design, Mr. Sevart opines: "The Hyster S40FT Forklift could have been designed to minimize the shearing motion between the mast sections. This could be accomplished by enlarging the distance between the two cross members." Doc. 65-4 at 3 (Sevart

17

Report).  Defendant argues the court should exclude this opinion because it's ambiguous and speculative.  Defendant's right.

Mr. Sevart's expert report lacks precision.  It doesn't specify how far apart he would design the crossmembers.  *See id.*  At his deposition, Mr. Sevart testified,

> Q.  And per your analysis, what should [the distance between the crossmembers] be enlarged to in order to make it safe?
>
> A.  Well, it wouldn't necessarily be enlarge—I mean enlarging it would be one option.  The other option would be to change the relative positions of the two things such that the gap never closed.
>
> I believe for an arm, that would need to be a four inch gap? . . .  [T]hat's just off recollection,  I believe that . . . four inches would be sufficient.

Doc. 65-5 at 13 (Sevart Dep. 46:18–47:3).  Mr. Sevart never explains why he recommends four inches.  As cited earlier, the Supreme Court explicitly has warned against this kind of analysis: "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Kumho Tire*, 526 U.S. at 157 (citation and internal quotation marks omitted).

Plaintiff argues that this is a "relatively simple and straight forward suggested alternative design . . . made by Mr. Sevart based on his years of experience and expertise in the design, fabrication, and testing of safety systems to reduce the risk associated with the use of agricultural equipment, industrial equipment and consumer products."  Doc. 70 at 15.  But Mr. Sevart never actually committed to this design alternative.  Instead, he simply testified, "enlarging it would be one option."  Doc. 65-5 at 13 (Sevart Dep. 46:21).  He's never tested any alternative designs.  Nor does he assert that the industry commonly uses his proposed alternative design.

The court is duty-bound to exercise its gatekeeping function to weed out unreliable expert testimony.  The court finds Mr. Sevart's third alternative design unreliable because he never

proposed a specific design, never tested an alternate design, and never explained why he proposed a four inch gap.  The court thus excludes this opinion.

In sum, the court excludes all three of Mr. Sevart's design alternatives for the forklift because the court finds them unreliable and, as a result, inadmissible.  Mr. Sevart has "fail[ed] to take any steps that would show professional rigor in the assessment of the alternative designs[.]" *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001) (affirming district court's exclusion of expert where expert failed to design a forklift with the proposed door).  The court next considers defendant's argument that Mr. Sevart is an unqualified expert.

### 4.    Plaintiff has failed to show that Mr. Sevart is qualified to opine in this specific field.

Last, defendant argues Mr. Sevart is unqualified.  Defendant asserts that Mr. Sevart has no specialized knowledge that would assist the factfinder.  Doc. 65 at 14.  Defendant faults Mr. Sevart for never designing a Class IV or V sit-down, counterbalanced forklift or designing any components or systems for such a forklift.  *Id.*  Defendant also asserts that Mr. Sevart lacks specialized knowledge because he's never certified compliance with a Class IV or Class V forklift's visibility standards, or participated in an ANSI B56.1 committee.  *Id.* at 14–15.  And, defendant points out, Mr. Sevart isn't "currently trained or certified to operate the [forklift] or any Class IV or V sit-down counterbalanced" forklift.  *Id.* at 15.  Plaintiff responds that defendant sets a "ridiculously high" expert witness standard that no expert could meet unless he'd worked for a forklift manufacturer or served on an ANSI committee.  Doc. 70 at 15.

Because the parties dispute the relevant standard, the court briefly returns to the governing law.  To qualify as an expert witness, the witness must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise*,

374 F.3d at 928 (citation and internal quotation marks omitted). "Though a proffered expert possesses knowledge as to a general field, the expert who lacks specific knowledge does not necessarily assist the jury." *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998) (citation omitted).

The court agrees with defendant. Mr. Sevart isn't qualified to proffer alternative designs for the forklift at issue here. In *Kinser v. Gehl Co.*, our Circuit held that an expert—with a bachelor's degree in industrial engineering, a doctorate in industrial engineering, product design teaching experience, litigation experience, and published articles—didn't qualify to testify about possible alternative designs for an agricultural baler because he had "no practical experience in mechanical design." 184 F.3d 1259, 1271 (10th Cir. 1999), *abrogated on other grounds by Weisgram v. Marley Co.*, 528 U.S. 440 (2000). Likewise, Mr. Sevart here has shown no practical experience in designing forklifts. The court finds Mr. Sevart unqualified to opine on the proposed design alternatives. But just because Mr. Sevart can't opine about the solution doesn't automatically bar him from opining about the forklift's problem.

Whether Mr. Sevart is qualified to opine about defects in the forklift is a tougher call. On one hand, Mr. Sevart is a licensed professional engineer, with a bachelor's degree in mechanical engineering. Doc. 70-4 at 1 (Sevart Aff. ¶¶ 2, 3). And Mr. Sevart has "expertise in the areas of design, fabrication and testing of safety systems to reduce the risks associated with the use of agricultural equipment, industrial equipment and consumer products." *Id.* (Sevart Aff. ¶ 4). On the other hand, Mr. Sevart hasn't designed or fabricated a Class IV or Class V forklift or forklift components  Doc. 65-5 at 8–9 (Sevart Dep. 26:15–30:3). And his areas of expertise— agricultural equipment, industrial equipment, and consumer products—are broadly generalized fields. To complicate matters more, defendant has overstated the relevant legal standard. That

Mr. Sevart never designed a forklift or worked for a forklift manufacturer doesn't disqualify him from testifying about alleged defects in a forklift. Nonetheless, the court ultimately agrees with defendant and finds Mr. Sevart unqualified.

Mr. Sevart's testimony does not "fall within the reasonable confines of [his] expertise" because Mr. Sevart has failed to demonstrate any expertise with forklifts. *Conroy*, 707 F.3d at 1169 (citation and internal quotation marks omitted). Mr. Sevart has expertise in design, fabrication, and testing of safety systems with certain equipment. But his *design* expertise doesn't apply here; he's never *designed* a Class IV or Class V forklift or a component of such a forklift. Doc. 65-5 at 8 (Sevart Dep. 28:16–29:1). Nor has plaintiff utilized Mr. Sevart's fabrication expertise. And the only testing in the summary judgment record is Mr. Sevart's testing of the forklift at issue here. Critically, Mr. Sevart doesn't even have the qualifications necessary to operate the forklift.

Mr. Sevart's expertise in design, fabrication, and testing of safety systems on industrial equipment shows that he has knowledge in a *general* field, but Mr. Sevart hasn't any *specific* knowledge of forklifts. In *Conroy*, a sex discrimination plaintiff proffered the expert testimony of an expert with a Ph.D. in business and 25 years of experience in human-resource management and organizational behavior. 707 F.3d at 1168. The plaintiff planned for the expert to testify about sex stereotyping in the workplace, to show that plaintiff's employer had discriminated against plaintiff on the basis of sex. *Id.* The district court excluded the testimony because the expert had failed to show sufficient expertise "in the 'particular field' of sex stereotyping." *Id.* at 1169 (quoting *LifeWise*, 374 F.3d at 928). The Circuit affirmed because the expert "concededly had no particular expertise in sex stereotyping." *Id.* The Circuit emphasized plaintiff's burden, as proponent of the expert: the expert's "general expertise was in business and human-resource

management, and her more specific expertise was in age discrimination, sexual harassment, and wrongful termination." *Id.* The Circuit acknowledged the possibility that "sex stereotyping is sufficiently related to these areas so as to be within their 'reasonable confines[.]'" *Id.* But plaintiff had the burden "to establish that connection, and she failed to do so." *Id.*

Likewise, here, plaintiff has demonstrated that Mr. Sevart has expertise in the design, fabrication, and testing of safety systems on industrial equipment. But that doesn't demonstrate sufficient expertise in the particular field of forklift safety and forklift design defects. It's up to plaintiff to connect Mr. Sevart's expertise to forklifts, and he has failed to do so. The court thus finds Mr. Sevart's opinions about the safety of the forklift unreliable.

One last thought: Plaintiff argues "it is within the realm of the jurors to determine what weight to give the testimony of an expert proffered to them[.]" Doc. 70 at 16. This approach would have the court cast aside its gatekeeping role. Because Rule 702 give experts "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation[,]" "[e]xpert evidence can be both powerful and quite misleading[.]" *Daubert*, 509 U.S. at 592, 595. "Thus, under *Daubert*, the district court performs an important gatekeeping role[.]" *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002). The recent amendment to Rule 702 confirms as much. "[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's notes to 2023 amendments. The court thus declines to abdicate its role as gatekeeper of expert testimony.

### C.    Motion in Limine Conclusion

The court thus finds that Mr. Sevart's proposed alternative designs are unreliable. And the court finds Mr. Sevart unqualified to testify about proposed alternative designs for the

forklift.  The court also finds Mr. Sevart unqualified to testify about the defects in the forklift because he lacks specialized knowledge.  As a consequence, the court grants defendant's Motion in Limine (Doc. 65).  Next, the court assesses the consequences of this decision for defendant's summary judgment motion.

### III.        Motion for Summary Judgment

Defendant also moves for summary judgment.  Doc. 67.  Defendant's summary judgment motion relies on its motion in limine, asserting that without any admissible expert testimony, plaintiff's claims fail as a matter of law.  The court agrees.  It explains why, below, starting with the governing summary judgment standard.

### A.        Legal Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant."  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v.*

23

*Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).  Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144 F.3d at 671).  Affidavits and testimony "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

Finally, federal courts don't view summary judgment as a "disfavored procedural shortcut."  *Celotex*, 477 U.S. at 327.  Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

### B.      Summary Judgment Analysis

Plaintiff brings strict liability and negligence claims based on the forklift's alleged design defect.  Doc. 63 at 13–14 (Pretrial Order ¶¶ 4.a.i., 4.a.ii.).  Defendant asserts that, without Mr. Sevart's testimony, these claims fail as a matter of law.  It's right.

The Kansas Product Liability Act[4] "applies to all product liability claims regardless of the substantive theory of recovery."  *Messer v. Amway Corp.*, 210 F. Supp. 2d 1217, 1227 (D. Kan. 2002) (citing *Savina v. Sterling Drug, Inc.*, 795 P.2d 915 (Kan. 1990)).  Under the KPLA, a product liability plaintiff can bring a claim, including a strict liability claim, "for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product."  Kan. Stat. Ann. § 60-3302(c).

Here, plaintiff alleges that defendant manufactured a product with an unreasonably dangerous design.  Doc. 63 at 13–14 (Pretrial Order ¶¶ 4.a.i., 4.a.ii.).  "Kansas law recognizes three ways in which a product may be defective:  (1) a manufacturing defect; (2) a warning defect; and (3) a design defect."  *Messer*, 210 F. Supp. 2d at 1227 (citing *Savina*, 795 P.2d at 923).

> To establish a prima facie case based on negligence or strict liability in a products liability case, plaintiff must produce evidence to establish three elements:  (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left defendant's control.

---

[4]      Kansas law governs the claims asserted in this diversity action.  *See* Doc. 63 at 1 (Pretrial Order ¶¶ 1.a., 1.d.) (invoking court's diversity subject matter jurisdiction and agreeing that Kansas law governs the case).  In a diversity case like this one, the court applies the substantive law of the forum state, including its choice of law rules.  *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1170 (10th Cir. 2010) (citation omitted).  Kansas courts follow the rule of *lex loci delicti* for tort claims, applying the substantive law of the place where the tort occurred.  *Anderson v. Com. Constr. Servs., Inc.*, 531 F.3d 1190, 1193–96 (10th Cir. 2008); *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985).  Here, the torts giving rise to plaintiff's claims occurred in Kansas—*i.e.,* the place where plaintiff sustained his injury.

*Id.*

Plaintiff relied on Mr. Sevart to provide all three requisite elements of his claims.  And plaintiff needed Mr. Sevart.  The "well-established test for determining whether expert testimony is required under Kansas law is whether the subject matter is too complex to fall within the common knowledge of the jury and is beyond the capability of a lay person to decide." *Ho v. Michelin N. Am., Inc.*, 520 F. App'x 658, 667 (10th Cir. 2013) (citation and internal quotation marks omitted).  The question, then, is whether a factfinder could understand the forklift's alleged design defects without an expert.

The court concludes expert testimony is required.  The design of a forklift and the failure of its safety systems simply is too complex for jurors to understand without expert testimony.  Plaintiff never insists otherwise.  So, plaintiff's claims fail as a matter of law, entitling defendant to summary judgment.

## IV.      Conclusion

As explained above, the court grants defendant's Motion in Limine (Doc. 65).  And, as a result, the court also grants defendant's Motion for Summary Judgment (Doc. 66).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion in Limine (Doc. 65) is granted.

**IT IS FURTHER ORDERED THAT** defendant's Motion for Summary Judgment (Doc. 66) is granted.

The court thus directs the Clerk of the Court to enter a final judgment comporting with the case-ending rulings memorialized in this Order.

**IT IS SO ORDERED.**

Dated this 2nd day of February, 2024, at Kansas City, Kansas.

<u>s/ Daniel D. Crabtree</u>
Daniel D. Crabtree
United States District Judge